Present: Kinser, C.J., Lemons, Millette, Mims, McClanahan and Powell, JJ., and Lacy, S.J.

RUSSELL REALTY ASSOCIATES,.ET AL.

v. Record No. 110380

OPINION BY SENIOR JUSTICE
ELIZABETH B. LACY
April 20, 2012

C. EDWARD RUSSELL, JR.,
INDIVIDUALLY AND AS
CO-TRUSTEE

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Randall D. Smith, Judge

In this appeal we consider whether the circuit court erred in granting judicial dissolution of Russell Realty Associates (RRA or the Partnership) pursuant to Code § 50-73.117(5) based on its findings that the economic purpose of RRA is likely to be unreasonably frustrated and that the business can no longer practicably operate in conformity with the partnership agreement. Because we find that there is sufficient evidence to support the circuit court's findings, we will affirm that judgment.

FACTS

In October of 1978, Charles E. Russell, Sr. created an irrevocable trust which he divided into two separate trust shares. One-half of the trust was for the benefit of his daughter, Parthenia Russell Randolph (Nina), and one-half for the benefit of Nina's children, Robert and Isham. The children's trust was subsequently divided into equal shares. Nina and her brother C. Edward Russell, Jr. (Eddie) were named

trustee (co-trustees) of Nina's trust, Robert's trust and Isham's trust.  The trust estate consisted of the interests held by Nina and Eddie as co-trustees in RRA.

Charles Russell created RRA at the time he created the irrevocable trust.  The purpose of RRA was to acquire, hold, invest in, lease and sell investment properties, including but not limited to real property.  The original capital of the Partnership consisted of real property which Charles Russell deeded to the Partnership.  The partnership interests were held by Charles Russell, Eddie, individually, and Eddie and Nina as co-trustees of the trusts created for the benefit of Nina and her two sons.  Between 1978 and 1985, Charles Russell decreased his partnership interest.  Following Russell's complete withdrawal from the Partnership in 1985, Eddie had a 50 percent interest in the Partnership, Eddie and Nina as co-trustees for Nina's trust had a 25 percent interest, and Eddie and Nina as co-trustees for Robert and Isham's trusts had a 12.5 percent interest for each trust.

The Partnership Agreement, as relevant here, provided that

7.  Management.  The partnership business shall be managed by all partners, but in the event of any disagreement between them the decision of Edward Russell shall be controlling.  As a matter of convenience, Edward Russell, shall have the authority, by his sole act, to borrow, execute, and deliver instrument[s], including any deed or lease, on behalf of the partnership.

2

. . . .

　　10.　Withdrawal.　No partner shall have the right to withdraw from the partnership.

. . . .

　　11.　Admission.　Additional partners may be admitted to the partnership by the unanimous vote of all the partners.

Eddie increased his active involvement in the operation of RRA over the years, and by the time Charles Russell withdrew from the Partnership, Eddie conducted RRA's business.　For many years Nina had not been actively involved in the management of RRA but was kept informed of RRA business matters and participated in business meetings electronically.　During most of this time she lived in Seattle, Washington.　Nevertheless, issues of communication and trust existed between Nina and Eddie.　For example, the financing and development of property which Eddie and Nina jointly owned, known as the Crossroads, was jeopardized because Nina delayed and vacillated in reaching decisions and executing necessary documents.　When Charles Russell died in 1992, leaving a number of properties to Eddie and Nina as tenants-in-common, the siblings engaged in strenuous disagreements over whether the properties should be developed or sold.　Nina and Eddie each hired separate legal counsel and finally reached an agreement on property division to avoid a partition suit.

In 1989, Harry R. Pollard, IV was engaged to act as a mediator and consultant to facilitate the relationship between Nina and Eddie and advance RRA partnership affairs. Pollard's involvement continued throughout the years up to and including the time of trial.

In 2003, Nina and Eddie began discussions about trust distributions because Nina's son, Rob, would be entitled to distributions in August 2004. These discussions also included issues relating to whether Rob would be admitted as a partner of RRA and whether the Partnership should be converted into a limited liability company (LLC). Nina and Rob's intentions and goals for Rob's admission as a partner and the conversion of RRA to a LLC differed from Eddie's intentions and goals on the future of RRA, particularly with regard to management control, liability issues and succession. Nina and Rob also disagreed with Eddie's recommendation that Rob's trust distribution be paid partly in cash and partly in property to ensure that Isham could receive an equal trust distribution. During the course of these discussions Nina, Rob and Eddie each retained separate counsel to represent their individual interests.

Over the next few years, negotiations concerning Rob's distribution from the trust, operational control of the Partnership, liability, and succession continued, by and through

4

counsel and Pollard, but the parties' differences and conflicts escalated.

By January 2006, the parties still were divided on these issues. Eddie sent a proposal to Nina and Rob in which he agreed to vote for Rob as a partner, conceded to Nina and Rob's demands on succession and liability issues, but continued to insist that he maintain management control of the business. Nina and Rob did not respond to Eddie's proposal. Months later, Eddie received a counter-proposal with different terms that were not responsive to Eddie's proposal. Further discussions were unsuccessful and Eddie ultimately told Nina that he would not agree to add Rob as a partner. This decision created more conflict and distrust among Eddie, Nina and Rob.

Following the stalemate on the restructuring of RRA and Rob's status as a partner, Nina increased her involvement in RRA's management, insisting that she, as well as Rob, be informed and involved in any and all RRA communications, including meetings, telephone calls, and written and electronic communications. During these communications she continually questioned or objected to Eddie's business management proposals or decisions. In addition, Nina began editing the minutes of the quarterly partnership meetings, asserting that they did not accurately reflect the substance of such meetings. RRA staff complained that the resulting minutes did not contain sufficient

narrative and were not objective or helpful in describing the business affairs conducted. Nina also insisted on two tape-recordings of all RRA meetings and meetings with third parties who were interested in purchasing RRA properties. Nina and Rob disputed the amount of the office overhead and, despite RRA's accountant's recommendations, opposed the continued employment of certain RRA staff members. Nina and Rob continued to insist that it was "critical" that RRA be converted into a LLC and claimed that Eddie was breaching his fiduciary duty by not accomplishing the conversion.

During negotiations for the sale of a parcel of land referred to as the "Manning property," Nina and Rob opposed obtaining an appraisal of the property and asserted that Eddie did not have the authority to sell the parcel. This disagreement created a stalemate and almost two years in delays regarding zoning and other city planning issues necessary for the disposition of the property. Even though Eddie had the authority under the Partnership agreement to proceed with the appraisal without Nina's concurrence, he filed a lawsuit "to avoid continuous opposition and problems in doing so." A lucrative offer for the sale of property known as the "Sam's Club property" was unrealized due to Nina's objection, even though she had initially agreed to the sale. Her change of

position apparently was in response to Rob's objection to the sale.

In January 2008, Eddie, individually and as co-trustee, filed a complaint seeking judicial dissolution and winding up of RRA pursuant to Code § 50-73.117(5). Eddie's complaint generally alleged that despite his ultimate decision-making and management authority under RRA's partnership agreement, "[s]erious and irreconcilable conflicts" exist between him, Nina, and Rob, and that the conduct and demands of Nina and Rob had frustrated RRA's economic purpose and made management of its assets and affairs not reasonably practicable.

Nina filed an amended intervenor complaint against Eddie, individually and as co-trustee, seeking an equitable accounting of certain legal and personal fees billed to RRA or the trusts. Nina alleged that Eddie breached his fiduciary duty as RRA's partner and as a co-trustee. Nina sought aid, guidance, and declaratory relief regarding her sons' rights to distributions from the trusts, and whether the trusts should reimburse RRA for certain sums. Nina also sought Eddie's removal as co-trustee based on, among other things, this lawsuit to force RRA's dissolution, his use of RRA assets to pay his legal fees, and his decision to withhold partnership assets payable to the trusts.

7

Eddie's complaint and Nina's intervenor complaint were tried together in a 13-day bench trial before the Circuit Court of the City of Chesapeake. The court denied Nina's claim for an equitable accounting, finding all RRA decisions, actions, and expenditures were adequately explained or addressed. The court further found that Eddie had not violated any fiduciary duty to the trusts or its beneficiaries.

The court granted Eddie's complaint for dissolution, stating that "[c]onsidering all of the evidence . . . the economic purpose of Russell Realty Associates is likely to be unreasonably frustrated" and that "the business can no longer practicably operate in conformity with the Partnership Agreement." The circuit court asked the parties to schedule a hearing "to discuss the mechanics of winding up" pursuant to Code § 50-73.119. Based on Nina's indication that she intended to appeal, the circuit court granted a stay of the dissolution order pending this appeal.

## DISCUSSION

The sole assignment of error before us in this appeal is whether the trial court erred in holding that Eddie "met the strict standards for judicial dissolution of a partnership under Va. Code § 50-73.117(5)." That section provides that a partnership "is dissolved" if, upon an application by a partner, there is a judicial determination that:

8

a. The economic purpose of the partnership is likely to be unreasonably frustrated;
   b. Another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or
   c. It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement.

Code § 50-73.117(5).  The parties have referred to these statutory bases for judicial dissolution as the economic purpose test, the partner conduct test, and the business operations test, respectively.  We also will use these terms in referring to the various statutory bases for judicial dissolution.

Judicial dissolution of a partnership occurs if a court finds that any one of the three statutory bases exists.  Code § 50-73.117.  In this case, the trial court dissolved RRA based on the first and third statutory bases: the economic purpose test and the business operations test.

We have not previously considered dissolution of a partnership under this provision.  However, in The Dunbar Group, LLC v. Tignor, 267 Va. 361, 593 S.E.2d 216 (2004), we considered Code § 13.1-1047, which addresses judicial dissolution of a LLC.[1]

---

[1] Code § 13.1-1047(A) provides:

On application by or for a member, the circuit court of the locality in which the registered office of the limited liability company is located may decree dissolution of a limited liability company if it is not reasonably practicable to carry on the business in

9

In that case, we held that the General Assembly imposed a strict standard for judicial dissolution of a limited liability company, deferring to the contractual agreement of the parties and allowing judicial dissolution only under the specific circumstances identified in the statute. In this case, the circuit court concluded, and Nina asserts, that given the similarities in the statutes governing dissolution of limited liability companies and partnerships, the same strict standard applicable to limited liability companies should be applied to partnership dissolution. We agree and will apply the same standard here.

Nina argues that the circuit court ordered dissolution of RRA on grounds not correlated to the statutory bases. Pointing to comments to the Revised Uniform Partnership Act (RUPA), Nina first argues that dissolution based on the economic purpose prong requires a showing of "truly poor financial performance."[2] That requirement was not met in this case, she asserts, because the record shows that RRA was a profitable, ongoing business, making distributions to the partners. According to Nina, the circuit

conformity with the articles of organization and any operating agreement.

[2] The Virginia General Assembly enacted Code § 50-73.117(5) in 1996 as part of the Virginia Uniform Partnership Act (1996) (the Act), Code §§ 50-73.79, et seq. See 1996 Acts ch. 292. The Act was based on the RUPA promulgated by the National Conference of Commissioners on Uniform State Laws in 1994.

10

court's conclusion that dissolution was appropriate under this prong was based solely on the court's observation that the partnership was not a "model of business efficiency" which does not qualify as a justification for dissolution of a profitable business under the statute.

The plain language of the statute and the comments to the RUPA that Nina relies upon do not support the standard Nina advocates for judicial dissolution under the economic purpose prong of Code § 50-73.117(5). The statute speaks of frustrating the "economic purpose" of a partnership, but does not define the term. Nina's construction would define the "economic purpose" of a partnership solely as the financial success of the entity, thus limiting judicial dissolution under this prong to poor financial performance of a partnership. The comment to the section of the RUPA corresponding to subsection 5 of Code § 50-73.117 states that the RUPA specifically deleted former § 32.1(e) of the Uniform Partnership Act, that allowed dissolution only when a business was carried on at a loss. RUPA § 801, cmt. 8. This requirement, the comment stated, could result in dissolving a partnership contrary to the partners' expectations due to the start-up or tax shelter nature of the business in which book or tax losses may not signify a business failure. The comment goes on to say that "[t]ruly poor financial performance may justify dissolution . . . as a frustration of the partnership's economic

purpose." (Emphasis added). This reference to poor financial performance explains only that such performance could be the basis for dissolution under the economic purpose prong, but it does not establish economic loss as the sole basis for dissolution under that prong. Indeed, the purpose of the change was to allow continuation of a partnership that was not financially profitable based on an inquiry into the partners' expectations in determining the economic purpose of the partnership. Neither the language of Code § 50-73.117(5) nor the RUPA comment relevant to that section requires that a partnership be a financial failure to sustain a judicial dissolution under the economic purpose prong.

Although in its letter opinion the circuit court referenced certain evidence when discussing its conclusions, both the letter opinion and order of the court stated that its decision was reached after consideration of all the evidence. The circuit court's judgment is entitled to the same weight as a jury verdict and its findings will not be set aside unless those findings are plainly wrong or without evidence to support them. The Dunbar Group, 267 Va. at 366-67, 593 S.E.2d at 219. Furthermore, we consider the evidence in the light most favorable to Eddie, the prevailing party. Id. at 367, 593 S.E.2d at 219. Accordingly, we will review the entire record to determine whether it supports

12

the circuit court's holding that the economic purpose of RRA could be unreasonably frustrated.

The purpose of RRA was to acquire, hold, invest in, and lease and sell investment properties. The partners' expectations for realizing these purposes included not only expectations of economic success, but also the ability to undertake these activities in an efficient and productive manner to maximize return to the partnership. The record shows, however, that not only did significant distrust and disagreement exist between the partners, but as relevant here, this relationship frustrated the ability of the Partnership to take advantage of a lucrative offer for the sale of the Sam's Club property and to secure certain zoning and appraisals for the Manning property in a timely manner. The record also demonstrates that the disruptive relationship between the partners has resulted in the Partnership incurring substantial added costs relating to the conduct, recording, and transcribing of meetings and minutes of the Partnership meetings, as well as the costs incurred in addressing litigation filed or threatened to be filed aside from the instant case. Additional costs have been incurred over the years by the need for Pollard's intervention, and in some cases, additional attorneys to facilitate communication and decision-making between the partners.

This record further shows that, despite the provision of the Partnership Agreement giving Eddie decision-making authority, the relationship between the partners imposed additional and unnecessary economic costs on the Partnership in a number of ways including preventing the Partnership from taking advantage of and conducting its business in a timely and efficient manner. The relationship also imposed significant additional costs in terms of the time spent resolving issues directly and indirectly affecting the purposes of the Partnership. The relationship between the partners has deteriorated over the years and nothing in the record suggests that it will improve. For these reasons, we conclude that the record supports the circuit court's holding that the economic purpose of the Partnership is likely to be unreasonably frustrated.

Accordingly, for the reasons stated, we will affirm the judgment of the circuit court.[3]

<u>Affirmed</u>.

---

[3] A partnership is dissolved if there is a judicial determination that any one of the statutory bases for dissolution contained in Code § 50-73.117(5) is established. In light of our holding on the economic purpose prong, we need not address Nina's arguments regarding the trial court's holding under the business operations test.

14